This Is Duran et al., Golden Buddha Corp. et al. v. United States. Mr. Swift, I see you reserved one minute for rebuttal. You can begin whenever you're ready. May it please the Court, my name is Robert Swift, and for 39 years I've been legal counsel for the class of almost 10,000 human rights victims who were abused during the regime of Ferdinand Marcos. My first point is that the forfeiture judgment obtained by the Philippines in 2009 lacked any in rem jurisdiction, which was If you speak right up, Mr. Swift, you're a little hard to hear. Go ahead. Thank you. There you go. Thank you, Mr. Swift. Again, the forfeiture judgment lacked any basis for jurisdiction. There was no in personam jurisdiction, and the Court so held. It relied on in rem jurisdiction on the basis that it had potential power over the race. But the undisputed facts in the case are that the AROMA funds were in custodia legis of the federal court in Hawaii. Now, your argument would basically do away with the substance of this 2467 rule because invariably the enforcement effort is in another jurisdiction, and the race is in the other jurisdiction. So it doesn't have to be. If 2467 is to operate, you've got to have the substance of the forfeited funds seeking to be forfeited have to be elsewhere. The reality is that, yes, in a forfeiture where you're trying to get recognition in the United States, the race is in the United States. But the foreign court must still have a basis for jurisdiction which would be recognized under U.S. jurisprudence. But in Philippine law, they found the head jurisdiction. And isn't it really the fact that this case doesn't begin until the department requests the forfeiture proceeding under 2467? You can't have a 2467 proceeding until that request is made. And so then the question is, we're talking about that particular action as opposed to the prior action in the Philippines. Well. I mean, that's the whole – this has already been through many of these points, this issue. Your Honor, there are certain statutory defenses to recognition of the forfeiture action in the Philippines. And perhaps the most important is that the foreign court must have had a jurisdictional basis. But it's the foreign court's law that would decide that, wouldn't it? Well, but a U.S. court is not bound by the conclusions of fact of a foreign court. Wait a second. But it's the foreign – it's the foreign law that decides – Philippine law decides whether the Philippine court had jurisdiction, doesn't it? Not exactly. Because every time there's a 2467 action, the U.S. court looks to see whether there's a factual basis for jurisdiction. And let's be –  But factual basis for jurisdiction under Philippine law. Well, whether it's under Philippine or U.S. law – It would be – it would be a little bit odd, would it not, that a U.S. court would apply U.S. law to Philippine facts to decide if a Philippine court had jurisdiction to decide if a Philippine judgment was legitimate? To the contrary. 2467 is intended to have all the defenses applied pursuant to U.S. law. Well, if the attorney general has concerns, the attorney general can reject the letter in question. And the attorney general's discretion is fairly broad here. So – but I find it curious that we would impose a U.S. legal grid over examining foreign judgments and deciding if those foreign judgments are legitimate under foreign law. Well, it may seem odd to you, but the fact of the matter is the statute itself says that, for example, there must be compliance with due process. Well, that's fair, but that doesn't mean – that means that the court will decide whether there is some reason why you wouldn't do it. But the jurisdictional judgment – in fact, the presence of that concern even further supports the idea that you'd use the foreign law first to decide if the foreign court had judgment under its own – Your Honor, to follow – Excuse me. Under its own set of rules. To follow your argument, you're arguing – The – what is the result of what you are articulating is that this court is being asked to recognize a fiction, a complete fiction which everyone knows is not true. So you're being asked to recognize, oh, they have in-rem jurisdiction because they have actual or constructive control of the race. The Ninth Circuit held in 2006 on bank that a Philippine judgment based on in-rem jurisdiction as to the realm of assets would not be enforceable in the United States, and they published that opinion. And that's also consistent with – These are funds that started out – the theory was that these are funds that started out in the Philippines and were stolen from Philippine citizens, right? No, that's not the theory. The money came, and this is undisputed, from an account in Switzerland from a Marcos crony, and it was transferred to New York. There's no evidence this money was ever in the Philippines. All right. Thank you. We have one minute of rebuttal. We'll hear from Mr. Robbins. Clay Robbins, Your Honor, on behalf of the Rojas Claimants. What I would like to do is just take my time and address the single issue that I think is underpinning the presence of my clients in this court, and that is one of standing. The record that we have presented shows that in January of 1971, a trench of gold was found by Roger Rojas in the Philippines. He took a portion of that gold back to his home where it was taken under force by soldiers at the direction of Ferdinand Marcos. It is that first taking of property that has been judicially recognized as being the first act of Ferdinand Marcos to take any property, whether it was public property or private property. And here, there's no question but that it was private property because under the law of the Philippines that we've addressed, once Mr. Rojas— But to have standing, you understand, Mr. Robbins, to have standing, you have to show that those gold bars can be traced to the $2 million that were in the bank account. And I don't understand where that link comes from. You have $10,000, right? The gold bars were worth $10,000? Approximately $10,000, yes, yes. How does that establish that the $2 million in the bank account is your clients' money? Well, let's bear in mind also that there is also the question of three handfuls of uncut diamonds, albeit that were not able to be valued. Nonetheless, there are of value, and they were taken from my client. Okay. But that notwithstanding— How is that, how are those diamonds linked to the bank account? That notwithstanding, requiring strict tracing of a victim of a crime such as this is just unreasonable. What is the difference between strict tracing and no tracing? There's no tracing, right? There's no—what? Well, we have tracing by circumstantial evidence. We have tracing by virtue of the date upon which the treasure was taken, the date upon which the payment was made to Orelma, and there was only a single payment of $2 million in November of 1972. And we also have the finding of the Philippine Supreme Court that the Marcos family had no source of revenue as of the time of the taking of the treasure, other than that which they were receiving from their government salaries. So you have that information and the fact that you have this crime that was committed and you have the intent— Do you have an adjudication of fact as to the tracing, though? There was never tracing, Your Honor. I will admit to that. No, no. Do you have an adjudication of fact? In other words, when you went—you have a judgment. We do. Fine. And is the judgment—the judgment, though, doesn't determine that the money ended up in a Merrill Lynch account in Hawaii. It does not. But the judgment wasn't meant and wasn't directed toward establishing that. The judgment was directed toward establishing Mr. Rojas's entitlement to the treasure. So all you have—what you have is a judgment of liability between the Marcos estate and your client—well, your—the decedent and your client's, well, and his estate, right? We are—it is an estate, yes. And it's also a business— You're a general judgment creditor. Pardon me? You're a general judgment creditor. We are not a general judgment creditor under the circumstances of this case, Your Honor, because— Well, wait a second. What court has said that the gold bars and the diamonds ended up being the $2 million that were deposited in the account? No court has yet— Wait. Let me finish. That became the Merrill Lynch account. No court has yet said that. So there is no judgment that confirms your argument. There is a—there is not a judgment as the court— There's a money judgment that you have, right? There is a what judgment? A money judgment that you have. There is a money judgment based upon a determination that certain property was taken from my client— Okay. —and that that property, our contention is, can circumstantially be connected and has been circumstantially connected to the Aroma account, because there is no other source of that money except that which was taken from it. Pardon me? How has it been circumstantially— It's circumstantially presented there by virtue of the timing of when the gold was taken and when the deposit— It's pure speculation on your part. Pardon me? It's pure speculation. It is not, Your Honor. It has to be different. Your particular—the value of the treasure at that point is very, very low. This is money that comes into the Merrill Lynch account from Switzerland. There's no reason to think that, you know, that this is even part of it, is there? At the very least, we have the understanding even if it's a part of that which was used to invest in the Merrill Lynch account. There's no question about that. We don't need to show that all $2,000 came from the monies that were taken from the gold that was taken from Roger Rojas. But what we were able to show is that the timing between and the incentive of Marcos to get rid of that which he stole from Rojas leads inferentially, certainly, to the purchase of this asset. There is no other showing, notwithstanding what the government has said, there is no evidence of the Marcos having any degree of wealth prior to the 1972 or 1971 taking from Rogers' home. All right. Thank you. All right.  Mr. Son. May it please the Court. Joshua Son of the United States. To address Duran's jurisdictional defense first, certainly the question of whether the Santa Pagayan had jurisdiction must be measured under the rules of the Santa Pagayan, the rules and the laws of the Philippines. And here the Philippine Supreme Court, this is at Rojas Joint Appendix, page 109 through 112, expressly addressed this argument. And it said, no, the fact that the funds are in the United States, not under the direct control of the Philippine courts, does not affect jurisdiction. So this is an opinion from the highest court of the Philippines addressing the precise argument that counsel is now raising, and they are rejecting that argument. So we view that that is the beginning and the end of the jurisdictional inquiry. When you have the highest court in the Philippines addressing this very argument, saying it does not deprive the court of jurisdiction. Well, if you were to view this in a general way, the fact that this statute is in both necessarily implies that the race is in a different country than the original judgment, doesn't it? Yes, absolutely. Otherwise, Congress, this statute would have no meaning, it seems to me. Yes, and that's a practical reason why we feel Durand's argument simply makes no sense. Well, it is a confirmation by Congress of the fact that you don't have to show that the race is in the original country. They're assuming it isn't. I would agree with that, Your Honor. Because that's the basis upon which this statute is enacted. I would agree with that, Your Honor. That's all right. So unless the Court has any other questions on the Durand jurisdictional defense, I would turn to the Rojas issues in the case. Here, as I think all the panel members recognize, there is zero tracing of the — Well, there's timing. He's pointing to timing. Even the timing. Marcos cashes in, gets whatever cash he has, and then accumulates it with other assets that he has. He actually did something in Switzerland and then the United States. That's essentially what Durand did. Well, so it's undisputed the vast majority of the Rojas treasure was not excavated until the mid-1970s. So all Rojas is left with is the $10,000 worth of gold bars and the diamonds that had no ascertainable or ascertained value whatsoever. And as for the timing, though, I think it's important to note it's quite looser than Rojas seems to imply. The rate of Roger Rojas' house was April 1971. The Arelma deposit wasn't made until November 1972. So you're dealing with an 18-month gap. It's hardly like a bang-bang situation where you might be able to infer if these two things happen right after each other. I thought I heard Mr. Rotten say that there was a finding by a Philippine court that they had no other assets at the time of the deposit. Is that accurate or not? No, Your Honor. What the Philippine court — what I believe counsel is referring to is the Sandovigayan judgment, the judgment that was eventually — that really is the focus of this 2467 action — had to decide whether the Arelma deposit was Marcos' legitimate wealth or not. And what it held was, look, Marcos' legitimate wealth, the salary he drew as president, was way out of proportion to these $2 million. So we are going to infer that the $2 million was illegitimate wealth. And that's what rendered it forfeitable. There was absolutely no finding that it came from Roger Rojas. Roger Rojas was not mentioned in the Sandovigayan. There was no finding about how much illegitimate wealth he had at that point in terms of millions and millions of dollars, right? In bank accounts or elsewhere, right? Right. All it held was that the assets in the — it was Case 141 in the Philippines — that the assets in Case 141, the hundreds of millions of dollars at issue, were vastly, vastly disproportionate to Marcos' legitimate salaried wealth. And therefore, you can infer it's illicit wealth and is therefore forfeitable. But there was absolutely no finding it came from Roger Rojas. There was absolutely no finding it came from the treasurer. The treasurer was not mentioned in this Philippine case. So Rojas is just respectfully engaging in wishful thinking that you had these $10,000 worth of gold and these unascertained diamonds taken. And then 18 months later, Marcos, one of the most egregious kleptocrats in history, makes a $2 million deposit, and that the deposit stems from the theft 18 months earlier. And there's just — there's just no basis for that wishful inference. So unless the Court has any other questions, I would reserve the rest of my time. The problem with Rojas is that if he had a judgment that had traced — had memorialized this, and in essence imposed a constructive trust on the assets, then he'd have standing to come before because he truly would be affected. Wouldn't you agree? Yes. Because it's the same — it's the same res. He's got a competing claim to the res. And he'd be in a position then where his property interest is fairly well defined. I would agree with that, Your Honor. But if we were to give the — I presume that you're concerned about the definition of effect of using — of finding that he fits within the term affected, would produce many, many litigation opportunities for other general creditors, those who might not even yet have reduced their claims to judgment, saying, well, I've really got a claim against the Republic of X, and I ought to be able to — because if this forfeiture goes through, that's another asset that I won't be able to execute against when I get my judgment. So it takes it — it expands it way beyond the concept of what one would see as kind of a concrete set of injuries. I do agree with that, Your Honor. All right. Lastly, as to Duran, Duran loses because? Duran loses because Duran has not made out a cognizable defense under Section 2467D1. All of the statutory defenses he's raised fail. The only one addressed thus far at this oral argument is the jurisdictional defense. But in the briefing, we laid out why he has not made out any defense. And at one time he had a judgment in the interpleader that entitled him to this asset. Did he not? We're not disputing Duran's standing. He had a judgment at one time, right? Yes. And he kind of hangs his head on that a bit. I'm anxious to see if he says something about a rebuttal. But that judgment doesn't exist anymore, does it? No, that judgment was wiped out by the Supreme Court's 2008 Pimentel decision. It took a little while for the district court judge to finally come around to what the Supreme Court wanted him to do, but kind of a curious thing from a federal judge's perspective. And the Supreme Court, I think, had some sharp words for the district court judge in that case. Noted. But certainly by the time the sound of a guy unruled, the district judge actually had, albeit belatedly, recognized that Duran's judgment was wiped out by Pimentel. All right. Thank you. Thank you. All right. Mr. Swift, you have one minute on the bottom. I think the fundamental disagreement that I have with the position that was articulated is that while a district court is required to accept the factual findings of the foreign court, it is not required to accept the legal conclusions of the foreign court. And I think that's fundamental to the statute and its interpretation. Okay. Also, if you did that, you would be taking out the explicit defense that is set forth in the statute requiring jurisdiction. And my earlier point was it's a total fiction that they had any control over the race, then or now. That's why they're here. So there was none. And certainly in the- If the race is always in a different country, I keep going back to this, then there would be no jurisdiction to start the case in a foreign jurisdiction under any circumstances. My time is up. If I had more time, I would go into the lack of notice, which is rather fundamental and a clear violation. All right. Well, you should have covered that before. All right. Thank you. Thank you. Mr. Rothman, you have one minute in rebuttal. Thank you, Your Honor. Again, I come back to the requirement of tracing and what I'm saying is strict tracing in a case such as this. There are courts within this circuit that have not just loosened the tracing requirement, but in some cases when we're dealing with the Ponzi scheme, they've even eliminated  They haven't required tracing at all. And here what we are arguing for is for the court to take the evidence that has been presented, albeit it is circumstantial, and taking the inferences from that evidence, except that there was money available to Marcos, there was an incentive to get rid of that asset as quickly as possible, and there has been no showing anywhere of any large investments of any assets legitimate or illegitimate by Mr. Marcos at any time prior to 1972, at a time when the only large asset he had would have been that which came from at least a portion of the treasure, the one-time gold Buddha and the diamonds of treasure. I didn't see it in the papers. Is there any evidence of what happened to that portion of the treasure that we're talking about? Subsequently, sales, transfers, you know, the Buddha sold, you know, anything of that sort. There are efforts of – there is evidence of efforts of Marcos to sell millions of tons of gold on the open market through contracts called Remington contracts. When? That would have been in about 1975 to 1978. So it post-states this, and it post-states the period of time when Marcos had gone back to the cave and taken out tons and tons of gold that had been left there, which formed the real substance of the wealth of Ferdinand Marcos. So there's no evidence that there were any subsequent transactions with regard to this particular part of the wealth, of the treasure? That is correct. We have no information about that. All right. Thank you to everyone. A reserved decision. Have a good day. Thank you.